IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DARRIUS WHITEHORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 6100 |
| | ) | |
| J.H. LAWSON, Star No. 8353, F.J. ESTRADA, | ) | |
| Star No. 4846, OFFICER HARRIS, Star No. 8145, | ) | |
| SHANI SUN EXTRADITION OFFICER, and | ) | |
| OFFICER BURTON, Star No. 17318, | ) | |
| in their individual capacities as Chicago Police | ) | |
| Officers, and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Darrius Whitehorn's Third Amended Complaint (Dkt. No. 76), which was filed

on August 26, 2010, alleges that the defendant Chicago Police Officers Jeffrey Lawson, Fred

Estrada, Charleston Harris, Shani Sun, and Craig Burton are liable under 42 U.S.C. § 1983 for

false arrest and false imprisonment (Counts I & II). That complaint also alleges that the officers

violated the Illinois Constitution (Count III) and intentionally inflicted emotional distress on

Whitehorn (Count IV). Finally, it alleges that the City of Chicago is liable for the officers'

actions (Count V).

Pending before the court is defendants' motion for summary judgment (Dkt. No. 101)

seeking judgment on all counts of Whitehorn's Third Amended Complaint. For the reasons

explained below, that motion is granted.

<u>BACKGROUND</u>

On August 17, 2009, Officers Lawson and Estrada started their shift in District 018 at approximately 10:30 p.m. (Dkt. No. 102 ("Defs.' SMF") ¶ 6.)[1] Officers Lawson and Estrada heard over the radio a call of a "person-with-a-gun" and traveled to the area of the intersection of Chicago Avenue and Lake Shore Drive on the east side of the City of Chicago to assist the responding unit. (*Id.* ¶ 8.) While en route, Officers Lawson and Estrada received an update over the radio reporting that a vehicle had been stopped, and that one or two occupants of that vehicle may have fled on foot and were still at large in the area. (*Id.* ¶ 10.) Officers Lawson and Estrada continued to travel south on Lake Shore Drive toward the intersection of Chicago Avenue and Lake Shore Drive. (*Id.* ¶ 11.) As Officers Lawson and Estrada approached Pearson Street, less than one block north of Chicago Avenue, Officer Lawson observed a vehicle stopped on Chicago Avenue facing westbound. (*Id.* ¶ 12.) Officer Lawson also observed two uniformed officers on foot running towards two male black individuals on Pearson Street, who were walking away from the area of the stopped vehicle. (*Id.* ¶ 13.) Officers Lawson and Estrada then turned west onto Pearson Street and, as they drove by the two officers on foot, one of the on-foot officers signaled with a hand gesture to Officer Lawson to catch up to the two walking males. (*Id.* ¶ 16.)

When Officers Lawson and Estrada reached the two males, Officer Lawson got out of the car and approached them on foot. (*Id.* ¶ 17.) The two males, Whitehorn and his friend, Jack,

---

[1] Although Officer Lawson testified that he and Officer Estrada started their shift on August 18, 2009, at 10:30 p.m., it is also undisputed that Whitehorn's arrest took place on August 18, 2009, at 1:20 a.m. (Defs.' SMF ¶¶ 6, 26.) It therefore appears likely that Officers Lawson and Estrada actually started their shift on August 17, 2009, at 10:30 p.m.

were very cooperative and both voluntarily produced State I.D. cards. (*Id.* ¶¶ 17-18; *see also* Dkt. No. 123 ("Whitehorn's Add'l Facts") ¶ 1.) Whitehorn and Jack told the officers they did not have a gun, and no weapon was found on either of them during a protective pat down. (Whitehorn's Add'l Facts ¶ 4; *see also* Dkt. No. 125 ("Defs.' Resp. to Whitehorn's Add'l Facts") ¶ 4.)

During this initial encounter, Officer Lawson ran Whitehorn's information through the squad's computer. (Defs.' SMF ¶ 19.) A "hit" came back, linking Whitehorn's name to an outstanding extraditable warrant. (*Id.*; *see also* Dkt. No. 122 ("Whitehorn's Resp. to Defs.' SMF") ¶ 19.) The full extent of the information contained in the "hit" viewed by Officer Lawson is unclear from the record. It is undisputed that the LEADS system listed the name "Darius Q. Whitehorn" (spelled with one "r") as one of three aliases used by an individual named Kirk Arthur Davis ("Davis"),[2] and that Davis was subject to an outstanding warrant extraditable to Indiana. (Whitehorn's Add'l Facts ¶ 2; *see also* Defs.' Ex. H ("LEADS Response for Davis").) Officer Lawson testified at his deposition that he did not actually view the LEADS Response for Davis, however, because he did not run Davis's name through the computer. (*See* Defs.' Ex. E ("Lawson's Dep.") at 38:2-39:11; 42:13-43:2.) It is Officer Lawson's testimony that the information generated by running Whitehorn's name through the computer would be different than the information generated by running Davis's name through the computer, and that he did not view the LEADS Response for Davis at the time of Whitehorn's arrest. (*Id.*) Rather, Officer

---

[2] The parties refer to this individual both as "Davis" and as "the wanted person." For ease of use, the court will use the name "Davis" to refer to the individual whom the out-of-state warrant identified as a wanted person. It is undisputed that Davis was a friend of Whitehorn's brother who had used Whitehorn's identification in the past to open a utility account in Whitehorn's name. (Defs.' SMF ¶ 56.)

Lawson testified that he "got a hit in the computer" when he ran Whitehorn's name, and that his computer showed "a hit of an extraditable warrant for this person that I have right now detained . . . regarding a full extradition to Indiana regarding a strong-armed robbery." (*Id.* 17:6-22.) Officer Lawson did not recall seeing any names other than "Darrius Whitehorn" on his computer, and did not further explain the details of the "hit" he viewed on his computer screen. (*Id.* 17:23-18:5.) Although Whitehorn asserts that the "hit" viewed by Officer Lawson after running Whitehorn's name through the computer is the same as the LEADS Response for Davis, (*see* Whitehorn's Resp. to Defs.' SMF ¶ 19), this assertion is not supported by the evidence cited in the record. Regardless, the parties do not dispute that Officer Lawson's computer search of Whitehorn's name generated some type of "hit" linking Whitehorn to the same outstanding extraditable warrant that is referenced in the LEADS Response for Davis.

After running Whitehorn's name through his computer, Officer Lawson called in Whitehorn's information over the radio and received a confirmation from OEMC dispatch that there was a "hit" on Whitehorn for an extraditable warrant. (Defs.' SMF ¶ 20.) Whitehorn was then handcuffed and placed in the rear of the squad car about five minutes after the initial stop. (*Id.* ¶¶ 22-23.) Whitehorn and Jack, who was also handcuffed in the rear of the squad car, were then driven back to the stopped vehicle on Chicago Avenue. (*Id.* ¶ 23.) Whitehorn and Jack were asked if they knew the individual in the stopped vehicle. (*Id.* ¶ 24.) Whitehorn and Jack each said "no." (*Id.*) Other than being asked if they recognized the individual in the stopped vehicle, nothing else was said to Whitehorn and Jack at the scene of the stopped vehicle. (*Id.*) Officers Lawson and Estrada then arrested Whitehorn based on the "hit" received and confirmed by Officer Lawson, and brought Whitehorn to the police station. (*Id.* ¶¶ 26, 28.) During the time

-4-

shortly after he was arrested, Whitehorn professed his innocence and urged Officers Lawson and Estrada to fingerprint him to prove his innocence. (Whitehorn's Add'l Facts ¶ 5.) In Officer Lawson's experience, both before and after Whitehorn's arrest, he has never had an arrestee ask to be printed. (Defs.' Resp. to Whitehorn's Add'l Facts ¶ 6.) Officer Estrada testified that he has occasionally had arrestees ask to be printed, but not often. (*Id.*; *see also* Defs.' Ex. F ("Estrada Dep") at 18:12-18.)

At the police station, Officer Lawson called the Chicago Police Department LEADS desk. (Defs.' SMF ¶ 28.) Officer Burton answered Officer Lawson's call, and confirmed that the NCIC national database showed a valid outstanding extraditable warrant linked to Whitehorn's name.[3] (*Id.* ¶ 29.) Officer Burton then gave Officer Lawson a "hold" number to enter in the arrest report of Whitehorn. (*Id.*) Officer Burton is the Field Inquiry Officer who handles all out-of-Chicago warrants (collar counties, cities, out-of-state, AWOL, Interpol, US Marshals), running LEADS (Illinois state) and NCIC (national) identifications. (*Id.* ¶ 30.) Officer Burton has the discretion to deem whether a fugitive warrant is valid or invalid. (Whitehorn's Add'l Facts ¶ 7.) After receiving confirmation from Officer Burton that Whitehorn was subject to a valid outstanding warrant extraditable to Indiana, Officer Lawson prepared the arrest papers and ordered a transport vehicle to take Whitehorn to the 1st District, where all extraditions are handled. (Defs.' SMF ¶ 31.) Officers Lawson and Estrada had no further involvement with Whitehorn or his detention. (*Id.* ¶ 32.)

---

[3] Again, Whitehorn argues that "the warrant 'hit' was for Kirk Davis's name, not Plaintiff's." (Whitehorn's Resp. to Defs.' SMF ¶ 29.) It is undisputed, however, that Officer Burton told Officer Lawson that Whitehorn's name was linked to a valid outstanding extraditable warrant.

Officer Shani Sun is and was the head extradition officer at all relevant times for the Chicago Police Department, where she is in charge of ten to twelve other extradition officers. (Defs.' SMF ¶ 35; Whitehorn's Add'l Facts ¶ 9.) On August 18, 2009, Officer Sun requested Davis's fingerprints from the Lake County Indiana Sheriff's Department. (Defs.' SMF ¶ 46.) The Lake County Indiana Sheriff's Department responded with a fax dated August 18, 2009, stating that it did not have any fingerprints to provide to Officer Sun. (*Id.* ¶ 47.) The Lake County Indiana Sherriff's Department also faxed a packet of material to Officer Sun, including a letter and warrant papers advising Officer Sun to detain Whitehorn for extradition to Indiana without bond, as well as a confirmation of the "hit." (*Id.* ¶ 44.) The packet of material from the Lake County Indiana Sheriff's Department identified Davis's name as associated with Whitehorn's Social Security number. (*Id.* ¶ 45.) That same day, Officer Sun also had Whitehorn's fingerprints compared to Davis's FBI fingerprint "class," as shown on the out-of-state warrant. (*Id.* ¶ 48.) Whitehorn's fingerprints came back as a possible match to Davis's FBI fingerprint class. (*Id.*)

Also on August 18, 2009, Whitehorn was brought before Judge Israel Desierto. (*Id.* ¶ 49.) Officer Harris presented Whitehorn's file to the court at the August 18, 2009 hearing. (*Id.*) Through his defense counsel, Lee Carson, Whitehorn advised Judge Desierto that he was not the person Indiana was seeking on the fugitive warrant, and counsel requested a continuance to a "short date" to determine "if in fact [Whitehorn] is not the person that they are truly seeking." (*Id.*; *see also* Defs.' Ex. O ("9/18/2009 Tr.") at 3:11-16.) Judge Desierto ordered a continuance of seven days, until August 25, 2009, to see if additional identifiers from Indiana could be

obtained to ascertain whether Whitehorn was the individual wanted by the State of Indiana. (Defs.' SMF ¶ 49.)

On August 19, 2009, the Lake County Indiana Sheriff's Department advised Officer Sun that the out-of-state warrant belonged to the Hammond Indiana Police Department. (*Id.* ¶ 50.) Officer Sun's team then requested Davis's fingerprints from the Hammond Indiana Police Department on several occasions between August 19, 2009, and August 24, 2009. (*Id.* ¶ 51; *see also* Defs.' Ex. B ("Sun Dep.") at 64:21-65:15; 85:1-19.) On August 24, 2009, Officer Sun received an email from the Hammond Indiana Police Department with a packet of information that included a picture of Davis. (*Id.* ¶ 52.) Officer Sun had in her possession a picture of Whitehorn and, immediately upon reviewing the photograph forwarded by the Hammond Indiana Police Department, Officer Sun was able to ascertain that the person the Chicago Police Department held in custody was not Davis. (*Id.* ¶ 53; Defs.' Resp. to Whitehorn's Add'l Facts ¶ 13.) On August 24, 2009, approximately two hours after receiving the packet of information from the Hammond Indiana Police Department, Officer Sun's team sent a message to the Cook County Jail advising them to release Whitehorn. (*Id.* ¶ 54; *see also* Whitehorn's Resp. to Defs.' SMF ¶ 54.)

It is undisputed that, at some point during her investigation, Officer Sun obtained the criminal history report for Davis that was on file with the Chicago Police Department. (Whitehorn's Add'l Facts ¶ 13; *see also* Defs.' Ex. I ("CPD Criminal History Report").) The CPD Criminal History Report appears under the name "Jason B. Owens," another of Davis's aliases, and includes a profile picture of Davis. (*Id.*) The CPD Criminal History Report lists the names "Kirk A Davis" and "Darius Q Whitehorn" as aliases used by "Jason B. Owens." (CPD

Criminal History Report at 1.) The CPD Criminal History Report also includes Whitehorn's date of birth and Social Security number as having been used by "Jason B. Owens" on a previous occasion. (*Id.*; *see also* Whitehorn's Add'l Facts ¶ 8; Defs.' SMF ¶ 38.)

The LEADS Response for Davis includes the following identifiers: black male; 5 foot 8 inches tall; 147 pounds. (Defs.' SMF ¶¶ 36-37, 40.) It is undisputed that Whitehorn is a black male, 5 foot 10 inches tall, who weighed 140 pounds on the date of his arrest. (*Id.* ¶¶ 36-37, 40.) The LEADS Response for Davis also includes two different Social Security numbers. (Whitehorn's Add'l Facts ¶ 8.) The first Social Security number listed in the LEADS Report for Davis, ending in -9563, is an exact match for Whitehorn's Social Security number. (*Id.*; *see also* Defs.' SMF ¶ 39.) The LEADS Response for Davis includes two different dates of birth: March 25, 1981, and February 25, 1986. (LEADS Response for Davis, Defs.' Ex. H.) Whitehorn's date of birth is February 25, 1986. (Defs.' SMF ¶ 38.)

<u>LEGAL STANDARD</u>

A grant of summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'material' only if the dispute's resolution might change the outcome of the suit under the governing law." *Spivey v. Adaptive Mktg. LLC,* 622 F.3d 816, 822 (7th Cir. 2010). The movant bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When ruling on a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving

party's favor. *Woodruff v. Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The court does not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

ANALYSIS

I.      Section 1983 Claim

"Section 1983 creates a federal cause of action for the 'deprivation, under color of law, of a citizen's rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Finwall v. City of Chi.*, 490 F. Supp. 2d 918, 921 (N.D. Ill. 2007) (quoting 42 U.S.C. § 1983). A claim under § 1983 requires that "(1) the defendant acted under the color of state law or invoked state authority, and (2) deprived the plaintiff of a constitutionally protected right." *Id.*; *see also Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

Whitehorn claims under § 1983 that the officers violated his due process rights and his Fourth Amendment right to be free from unreasonable searches and seizures, first when Officers Lawson and Estrada falsely arrested him, and second when Officers Burton, Sun, and Harris falsely imprisoned him by wrongfully continuing to detain him without conducting an adequate investigation. The court will address each alleged violation in turn.

A.      False Arrest

Whitehorn alleges that Officers Lawson and Estrada violated his Fourth Amendment right to be free from unreasonable search and seizure by detaining him without probable cause or a warrant. The existence of probable cause is an absolute defense to a false arrest claim under § 1983. *Smith v. City of Chi.*, 913 F.2d 469, 473 (7th Cir. 1990). Probable cause exists if, "at the time the decision was made, the facts and circumstances within the officers' knowledge and of

-9-

which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the individual had committed or was committing an offense." *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) (brackets, quotation marks, and citation omitted).

The evidence in the record shows that there can be no genuine dispute that probable cause existed at every stage of Whitehorn's arrest. First, Whitehorn does not dispute that Officers Lawson and Estrada had reasonable suspicion to stop him initially. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968); *United State v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995). Officers Lawson and Estrada stopped Whitehorn around midnight in the vicinity of a stopped vehicle after receiving a report that the occupants of the vehicle were fleeing on foot and may have had a gun. Officer Lawson observed the stopped vehicle and two uniformed officers running towards Whitehorn and his friend, Jack, who were walking away from the stopped vehicle. One of the officers signaled to Officer Lawson to catch up to the two walking males. Because Whitehorn and Jack may have had a gun, were walking away from a suspicious vehicle, and were pursued by police officers, the undisputed material facts establish that Officers Lawson and Estrada had reasonable suspicion to stop them for a brief investigation.[4]

Officers Lawson and Estrada also had probable cause to arrest Whitehorn after running his name through the computer and discovering a "hit" in the LEADS system linking Whitehorn's name to an extraditable warrant. That hit was confirmed when Officer Lawson called in Whitehorn's information over the radio. The existence of the outstanding warrant

---

[4] The events in this case took place before the Supreme Court's decision in *McDonald v. City of Chicago*, and thus before the City of Chicago's ordinances "effectively banning handgun possession by almost all private citizens who reside in the City" were held unconstitutional. 130 S. Ct. 3020, 3026 (2010). The officers' reasonable suspicion that Whitehorn and Jack possessed a gun thus provided probable cause to believe that they were committing an offense.

linked to Whitehorn's name was more than sufficient to provide probable cause to arrest him. *See Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987) (holding that a police officer "would have been imprudent not to take in [a suspect] for further investigation" when an apparently regular warrant identified the suspect's name as an alias, even when the address and birthdate on the warrant did not match the suspect's information). Accordingly, Officers Lawson and Estrada acted reasonably in arresting Whitehorn.

Whitehorn contends that the officers should have known that Whitehorn was not the individual in the warrant because there were two Social Security numbers on the LEADS Response, one of which did not belong to Whitehorn, Whitehorn's height differed from that of the individual described in the warrant by two inches, and Whitehorn's weight differed by seven pounds. Even assuming those discrepancies were significant, Officers Lawson and Estrada could have reasonably inferred that they were, like the alias, falsified data. *See Brown*, 823 F.2d at 169 (holding that "it would not be surprising if [a suspect using an alias] also has a false address and birthdate"); *see also Hill v. California*, 401 U.S. 797, 803 (1971). Whitehorn also contends that his protestations of innocence and his request that he be fingerprinted should have alerted the officers that they had the wrong person. Assertions of innocence by a suspect using an alias, however, are certainly not sufficient by themselves to vitiate probable cause if other facts establish that it exists. Moreover, the Constitution does not require fingerprinting of all criminal suspects before taking them into custody. *Cf. Patterson v. New York*, 432 U.S. 197, 208 (1977) ("Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person."). Consequently, because the undisputed material facts establish that probable cause existed to arrest Whitehorn, summary

judgment is appropriate on Whitehorn's claims in Counts I and II against Officers Lawson and Estrada.[5]

B.      False Imprisonment

Whitehorn next alleges that the City of Chicago and the defendant police officers inappropriately detained him for six days despite continuous protests from him and his family that they had the wrong person.

"The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released." *Baker v. McCollan*, 443 U.S. 137, 145 (1979). On the other hand, "[d]ue process requires government to follow reasonable procedures for minimizing mistaken deprivations of liberty." *Atkins v. City of Chi.*, 631 F.3d 823, 827 (7th Cir. 2011). "In determining what is reasonable 'the court must consider the weight of the interest at stake, the risk of error, and the costs of additional process.'" *Id.* (quoting *Hernandez v. Sheahan*, 455 F.3d 772, 777 (7th Cir. 2006)).

The first officer who Whitehorn alleges is liable for his errant detention is Officer Burton, the Field Inquiry Officer who reported to Lawson that the warrant implicating Whitehorn was valid. Officer Burton's role in Whitehorn's detention is limited, involving little more than reporting that the NCIC database listed a valid warrant linked to Whitehorn's name.

---

[5] Count II of Whitehorn's Third Amended Complaint mentions 42 U.S.C. § 1985 in passing. Neither party mentions a claim under § 1985, so the court assumes that Whitehorn has not brought one. In any case, the only provision of § 1985 conceivably implicated by Whitehorn's allegations is § 1985(3). "The function of § 1985(3) is to permit recovery from a private actor who has conspired with state actors." *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009). Section 1985(3) thus has no applicability here, where all defendants are state actors. *Id.* Accordingly, the court grants summary judgment to the defendants on Count II.

Whitehorn contends that Officer Burton had discretion to determine if the warrant was valid or not, but Whitehorn has presented no evidence suggesting Officer Burton's determination of validity was unreasonable. Accordingly, Officer Burton is entitled to summary judgment in his favor.

Next, Whitehorn alleges that Officer Harris is liable as the hearing officer who presented Whitehorn's file at the court hearing on August 18, the day after Whitehorn's arrest. There is no evidence that Officer Harris made any misrepresentations at the court hearing, and there is no evidence that Officer Harris should have deduced from the file in his possession that Whitehorn was being inappropriately detained. Indeed, Whitehorn's response fails to even attempt to articulate any reason to deny summary judgment to Officer Harris, suggesting that Whitehorn has abandoned the claim against him. (*See* Dkt. No. 121.) Summary judgement in favor of Officer Harris is appropriate.

The third officer who Whitehorn contends contributed to his allegedly unconstitutional detention is Officer Sun, the head extradition officer who took charge of the investigation into Whitehorn's identity. Whitehorn's argument rests on evidence that Officer Sun had access to a Chicago Police Department report that included a picture of Davis sometime prior to August 24, and that Whitehorn's family repeatedly called to protest that Whitehorn was the wrong person. Neither piece of evidence is sufficient to avoid summary judgment.

First, the evidence of the phone calls from Whitehorn's family is inadmissable hearsay, because it comes from Whitehorn's own deposition testimony reporting what his family told him. *See* Defs.' Resp. to Whitehorn's Add'l Facts ¶¶ 11, 12. In any case, even assuming Officer

Sun received phone calls asserting that the officers had mistakenly identified Whitehorn, Officer Sun reacted reasonably by further investigating Whitehorn's status.

At every stage of that investigation, Officer Sun's actions were reasonable. Specifically, she requested Davis's fingerprints and other information from the Lake County Indiana Sheriff's Department. The packet of information she received on August 18 has a confirmation of the "hit" but did not have fingerprints or any picture that would have helped Officer Sun identify that Whitehorn was not Davis. On the same day, Officer Sun received further evidence suggesting that Whitehorn had been identified correctly when she learned that Whitehorn's fingerprints matched Davis's FBI fingerprint "class." Officer Sun continued to request further information from the Hammond Indiana Police Department, and when she received a picture of Davis that did not match her picture of Whitehorn, she ordered Whitehorn released.

The only evidence of a possible misstep in Officer Sun's investigation is that at some point, Officer Sun received access to the Chicago Police Department Criminal History Report on "Jason B. Owens," an individual who used "Kirk A Davis" and "Darius Q. Whitehorn" as aliases. (Defs.' Ex. I.) The report contained a profile picture of "Owens." Whitehorn contends that Officer Sun acted unreasonably by not comparing the photo of "Owens" to her photo of Whitehorn (Defs.' Ex. B.) to determine that they were different people. Even assuming that a reasonable person could have determined that the photos depict different people, however, Officer Sun could have reasonably doubted whether "Owens" was the same person as the "Davis" that Indiana was seeking, especially in light of the false identities in the case. Because the warrant was issued by the Indiana police, the court holds that there is no genuine dispute of material fact that it was reasonable for Officer Sun to wait for information from Indiana to make

the determination on Whitehorn's identity, rather than relying on old Chicago Police Department arrest records.

That conclusion is consistent with the outcome of *Baker v. McCollan*, the case in which the Supreme Court established the standard for false imprisonment claims. 443 U.S. 137 (1979). In *Baker*, the Court held that a plaintiff wrongfully detained for three days despite his repeated protests of mistaken identity failed to allege a cause of action for false imprisonment because he had been detained pursuant to a valid warrant. *Id.* at 145-46. The Court stated that

> [g]iven the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation" of an accused's "claim to mistaken identity."

*Id.* at 145-46. The Court noted further that the plaintiff could not be "detained indefinitely," without an investigation, but held that the plaintiff's three-day detention did not rise to the level of a deprivation of constitutional rights. *Id.* at 144-45. Whitehorn's six-day detention, throughout which law enforcement personnel worked diligently to investigate his claims of innocence, falls into the same category, and it does not rise to the level of a constitutional deprivation of rights. Accordingly, summary judgment in favor of Officers Burton, Harris and Sun is appropriate on Whitehorn's claim of false imprisonment in Counts I and II.

## II.     Claim of Intentional Infliction of Emotional Distress

To succeed on his claim for intentional infliction of emotional distress under Illinois law, Whitehorn must establish (1) that the defendant's conduct was extreme and outrageous; (2) that the defendant intended his conduct to cause severe emotional distress, or was aware of a high

probability that his conduct would cause severe emotional distress; and (3) that the conduct actually caused severe emotional distress. *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 983 (7th Cir. 2008). Because the officers all acted reasonably, as described above, there is no extreme and outrageous conduct demonstrated in the record. Moreover, nothing in the record supports Whitehorn's claim that the officers intentionally caused Whitehorn severe emotional distress. Summary judgment in favor of the defendants is appropriate on Count IV.

III.    Claims against the City of Chicago

A municipality is not liable under § 1983 unless the plaintiff can demonstrate that a constitutional deprivation occurred as a result of a city policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Boilerplate allegations of the existence of a municipal policy without any factual support are insufficient. *Sivard v. Pulaski Cnty.*, 17 F.3d 185, 188 (7th Cir. 1994). Here, Whitehorn has not presented any evidence of the existence of a municipal policy, so the City of Chicago is not liable under § 1983. Moreover, because none of the individual defendants are liable, the City of Chicago cannot be liable to indemnify their actions. Summary judgment for the City of Chicago on Count V is appropriate.

IV.    Claim under the Illinois Constitution of Unreasonable Search and Seizure

The parties' briefs are silent on Whitehorn's claim that his right to be free of unreasonable searches and seizures under the Illinois Constitution was violated. However, the Illinois Supreme Court "has interpreted the search-and-seizure clause of the Illinois Constitution in a manner consistent with the United States Supreme Court's fourth-amendment jurisprudence." *People v. McQuown*, 943 N.E.2d 1242, 1247 (Ill. App. Ct. 2011). Whitehorn's

failure to survive summary judgment on his federal claim under § 1983 therefore dooms his state claim in Count III as well.

CONCLUSION

For the foregoing reasons, the defendants' "Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(b)" (Dkt. No. 101) is granted. The court enters summary judgment against plaintiff Whitehorn and in favor of all defendants on all counts.

ENTER:

James F. Holderman

JAMES F. HOLDERMAN

Chief Judge, United States District Court

Date: February 21, 2012